Good morning. May it please the Court. Daniel Guttenplan from Edenstein Famine Glass for the Appellants. I'd like to begin by addressing the ruling from the Court below on the motion for judgment as a matter of law and two specific aspects of it, both that relate to our trade secret claim. The first is the distinction between source code and software. Source code is a part of software, yes, but they are two distinct categories of trade secrets. That was made clear throughout the trial and it was made clear in the trial court's own jury instructions where, more than a dozen times, the court listed, as it read to the jury and gave them instructions, the categories of trade secrets. And among those four categories were source code and software. There is, focusing on software for a moment, there is ample evidence in the record to show that appellants created and owned proprietary software. That includes the flagship software, Moving Matrix. It includes Quote Runner Direct, Home Expert Direct, Movers Direct, and DeJoka. But don't you have to show that something about this software was not available in the market, was different, was secret? So how do we know that the way that you created it wasn't sort of taking a piece of this thing and taking a piece of this thing that are off-the-shelf software packages? I think you have to show that you didn't do that. Absolutely, we have to show that. We have to show to qualify as a trade secret that it's confidential and that it has value from being confidential. Now, just as an aside, a trade secret, and we'll get to this with the Google AdWords, a trade secret that is a compilation can have things in it that themselves are publicly available, but when amalgamated creates something that's confidential. But back to your Honor's question, you can see that in the testimony and find that in the testimony of Charlie Katz, who is the 100% owner, founder of all these companies, who testifies specifically with respect to Moving Matrix, going back 14 years prior to our trial date, which was over a year ago, going back 14 years, working with software developers, internal and external, that he hired, spending more than a million dollars in developing the suite of software, building it from scratch from the ground up. So you have that evidence before you. As I read Mr. Katz's testimony, there's sort of a description of what the software does, but maybe I'm just restating the question that Sridharan asked. It was not clear to me where he said that it does it in some way that nobody knows about or that there's some aspect of it. The mere fact that you've spent a lot of time developing it doesn't necessarily mean that there's a protectable secret to it. Well, I think we can infer from the fact that it was kept confidential and private and protected the whole time, that we built it from scratch, that it gives us an advantage in the marketplace, that it is critical to the operation of our business, which sets us apart from our competitors, that we don't license it to anyone, that no one else has access to it. I think you can infer that it is confidential and it is proprietary. Why else would he go out of his way and spend $10 million, 14 years of research to build this thing if he could go buy it off the shelf or put things together or certainly license someone else's for cheaper that could do the same thing? That software is not out there. And I think the testimony, when held in the right light and studied, does support that. If we agree with you that one of the claimed trade secrets was indeed a protectable secret but one or more of the others was not, what should we do? Well, you have to reinstate the verdict because all we needed to prove was one category of trade secrets. So let's leave software for a moment. And just to clarify, it's not a problem that multiple theories were presented to the jury and by the assumption of the question, some of them were bad as long as one of them is good. Do you think that's enough to uphold the verdict? So I'm clear. When you say multiple theories, are you referring to multiple categories of trade secrets? Correct. Yes. No, not at all. And, in fact, I think if we revisit Judge Klosser's jury instructions, it was made clear in the instructions that to find the defendants liable for misappropriation of trade secrets, they don't have to find that they stole our customer list, they stole our software, they stole our source code, and they stole our Google AdWords accounts. They only have to satisfy one of those. And, of course, because we were arguing the entire time, we alleged in our pleadings, we argued throughout the case, I presented at trial, and the judge instructed in jury instructions that those were all severable categories of trade secrets, which the law recognizes that they are. With respect to Google AdWords and, again, revisiting the J-Mall motion, I hope it's okay if I refer to it as that. It's a little shorter. Actually, can I take you to a different topic because you don't have to go wherever you want to go? And I would like to reserve two minutes. I'm wondering about the breach of contract damages. So I was able to reverse engineer, I think. It seems like they awarded Ms. Suthar 11 months of her salary as the breach of contract damages. It seems like they probably did the same thing for Mr. Suthar, but I can't find his salary for 2020 in the record. Is it in the record? I'm not sure if it's in the record. I don't have that information in front of me. I can tell you that I believe that the ruling on the J-Mall motion that vacated that award on the breach of contract damages held was analyzing those damages under lost profits, which we did present a model. Mr. Pampanella, our damages expert, did present that sort of model. But that's not what the jurors awarded, which, Your Honor, astutely surmised. They were awarding damages that was effectively scaling back money that the Suthars had earned while working on their pet project, their clone business, cashing paychecks. Because it's the 11 months that is the allegation that they were working for the other company at the same time. What about just this damages expert's report? Is it in the record, the expert report? I believe it is. The full report is? Can you point me where? You know, I can't un-rebuttal. I have his testimony, but I didn't see his report. I don't have his EOR. He has an exhibit. I'm sorry. Let me correct myself. I don't believe his full report is in the record. He has an exhibit that he testified with that's in the record. I'm wondering if there's any explanation of that in the record beyond just the testimony that we know about. Well, there's not, which, of course, leads us to our other point, which is that, or one of our other points, I got to put my damages expert on for 10 minutes. I was allotted four hours to put on a complicated trade secret and breach of fiduciary duty and other claims case, scaling back over 20 years of creation of this company. Ms. Southar herself was there for a decade. And with respect to Mr. Katz's testimony, which Judge Miller was poking holes in, rightfully so, or at least analyzing heavily under a microscope, I was able to put him on for barely more than an hour. And after 19 minutes of putting him on, I was admonished in front of the jury for wasting too much time on background. After 19 minutes, this guy spent 20 years building this company from scratch. And by the time that we got to the point where I could put on one of my three experts, and I was only planning at that point to call two of them, I only had 10 minutes to put him on. Counsel, I'm speaking just for myself, but I don't think that the court is willing to agree with, is willing to go so far as to say that a trial court's time is infinite and you can get as much time as you think you need. But I was trying to figure out what you were asking for as the more reasonable time. Absolutely. And I will very quickly go through that timeline. So first of all, understand, I inherited this case mid-through actually in the scheduling conference after the schedule was set. My predecessor counsel, together with my opposing counsel, went through the scheduling process with the court and they estimated a 7-10 day trial, which at that point I would have taken. In January of 2020, excuse me, 2022, when we had a late February trial date, which was ultimately moved, then we had gone through discovery. Then I had taken depositions. Then we had fought tooth and nail about everything and every crevice of everywhere. And I gave the court an updated schedule where I said there's no way that we could possibly try this case in 7-10 days. It's what I do for a living. And I wanted to advise the court for the court's own schedule. I just don't see how we could get this done. So I think I estimated something like 20 days in that schedule. Closer to the ultimately we had our pretrial conference on April 18th. Before that pretrial conference, at that time the trial was set for May 3rd, we had filed in the days leading up to that a witness list with our estimated testimony, which I think estimated about 54 hours of witness time. Now, I'm not saying you don't give me 54 hours of witness time and it's unreasonable and it's an abusive process. Of course I'm not. What I'm saying is this is the absolute other end of the spectrum. And when you look at every single one of our cases, collectively, both sides that were cited on this time limit issue, there's not a single case that's anywhere close to the time limitations that we were given. The closest, I believe, is about 10 hours. The rest are several days, 18 1⁄2 hours, and these were ones that were being challenged on appeal as well. And almost all of those cases, the court of appeal, if they are denying the appeal on the hours issue, references the flexibility of the trial court. They let them go on a little longer. They gave them an extra hour, an extra day, an extra witness. This was the exact opposite. This was inflexible, rigid. When you look at the statements that the trial court gave at that pretrial conference, I set the time limits. You're going to get what you're going to get. In 20 years, I've virtually never gone past this. I've never given anyone more time. The trial court judge referred to himself as the butcher. So why it seems—so I asked before about whether the damages expert is in the record. I've had trouble finding anything where you've said, look, I'm just to preserve our objection to this time limit. Here's all the stuff we would have entered. You didn't seem to do that in the district court, and we don't have it here then either because of that. So we can't look at the expert report on damages and say, oh, I can tell what he would have spent three more hours on because all of this extra detail is actually in the report. Presumably that's what they would have done. Why don't we have any explanation of what you would have done? Well, there is an explanation in my briefing of what I would have done. But it's not very specific. It's not like here are these five documents that we didn't get to present. Here are these whatever things that we didn't present. Okay. The witness list is in there. You can see all the witnesses that I didn't get to call, which most importantly, by the way, going back to my opening in the trade secret claims, includes my trade secret expert who would have gotten up there and would have talked about all these things and what they are and why they're trade secrets and what a trade secret is. Is he the one who wasn't available that week, though? Mr. Rushton, he would have been available if we had time to call him. Okay. I thought you said. He's in Kentucky. And so the other. I don't want to. I know the other problem was. I don't want to waste time on this, but you have to understand. It wasn't as if the week that we went to trial, we had noticed we were going to go to trial. The trial was set for May 3rd, I believe. And every Monday thereafter, it kept getting continued, continued and continued. When I have someone in Kentucky, I have them on standby. And all of a sudden, I've got two days to try a case total with everything. It's tough to just at the drop of a hat, get them to come here. So can I just ask if we were to agree with you that the damages awards need to be reinstated, do we need to reach any other issues? Like we wouldn't have to reach this four-hour issue if we reinstated. So it's all in the alternative in your brief. Is that right? That's correct. And I think we've outlined the requested relief in order. We think reinstating the verdict, the damages award, is what should happen. If the court is not inclined to do so, then we would like the court to look at our preemption claim, which I may get to on rebuttal if I have time. And I think it's very powerful, as well as the four-hour claim. Well, when the trial judge overturned the verdict, he said, as I recall, that you had not shown what the nature of the trade secret was, essentially. And was there then a motion for new trial or something that said, I had this witness who was going to testify to it, and you didn't let me do that because of the time limitation? No. And that would have been all for naught at that point. It would have only been for supplementing the record for your honors purposes. What I mean is the trial court judge made very clear that we were never getting more time, that he was never going to revisit anything. But it would have made the record that you were deprived by the time limitation of a specific witness that was going to make a difference. We don't have that. I understand. I think we do have that. And I do want to reserve at least one minute, so I'm going to go very quickly. I think we do have that. I think when you look at my pretrial witness list that was filed about a month before, and you look at the witnesses in there with descriptions of what they were going to testify to, granted brief, and you look at my papers where we talk about Mr. Rushton, we talk about other witnesses that we might have been able to call. I agree it's not perfect, and I recognize that. But I think you can piece that together. I will reserve one minute and one second. Good morning, Your Honors, and may it please the Court. My name is Kirsten Hart, and I represent the respondents in this matter. This Court should affirm the take-nothing judgment for two reasons. First, each of the four plaintiffs failed to provide non-speculative proof of damages as to any of their claims. Those are the claims that went to the jury and those that did not. This is clear through the expert testimony of James Pampanella, who, on cross-examination, confirmed that there was no evidence of any damages that any one plaintiff had suffered. So can I ask you about this? I think there was testimony that the four companies essentially worked together, shared customers, moved customers around between them. So if we take the notion that they were sharing customers equally, and we have the damages expert saying this theft of trade secrets led to them losing a whole bunch of customers, why is it irrational to just divide it in fourths and say they were sharing customers equally, so they shared the damage equally, and so we give them each one quarter of the damages? What's wrong with that? Well, first of all, there is no evidence in the record of equal customer sharing, and this is a really critical point. So there are four plaintiffs that do four different things. These are four separate corporations formed at four different periods of time across more than a decade. They're organized in different states, and they do different things. For example, Budget Van Lines is a moving brokerage. That means that it connects people who want to move with companies that will help them move. Movers, Budget Van Lines, Equate Media. Equate Media is in moving lead generation. They sell leads. They sell the information of people who want to move to people who are either brokers or moving companies. A third example that's probably the most salient is Home Expert. Home Expert is one of the four plaintiffs. They're not even in the moving industry. They are in lead generation for home repair. They connect people who want their house painted, who want plumbing done, with individuals who can do that. So to say that they're even in the same industry, let alone connected with the same customers, is a completely false input of information. And this is why it is improper to have a single number go to the jury and have the jury return 14 separate verdicts based on that single element of input. And that's exactly what the jury was instructed to do. Jury instruction number four required that the jury decide the case as to each plaintiff and defendant separately. And then in the special verdict form, the jury had to identify plaintiff by plaintiff, claim by claim against each defendant how much that plaintiff had been harmed. But the plaintiff's evidence left the jury to speculate because it failed to show what any one plaintiff, let alone every plaintiff, claimed that it had suffered. The second reason this court should affirm is because plaintiffs failed to provide evidence of any trade secrets that any one of them owned. We agree that the categories of trade secrets at issue here are Google AdWords, which are now cast as marketing data, software, and source code. But identifying categories of potentially trade secret protected information is not enough. As to the Google AdWords marketing data, plaintiff's witness, Mr. Katz, did not identify a single Google AdWord that he claimed. I thought he did give an example. I mean, he gave one example, right? He gave an example of what Google AdWords are. But he did not say, this is a Google AdWord that any of the four plaintiffs own. Okay, but he, I mean, he gave an example of what they are. He did say that they owned, that there were categories of words that they were using, right? And there were the words and also the, I think it was the conversion rate data that they had, right? So he gave a description of what kind of data he was talking about, right? What more do you think he needed to provide? Exactly so. So the information that was provided in the record are broad categories of potentially protectable information. But it is not enough to even use a magic word, an algorithm, a compilation. What he needed to do was say, what makes this special? And when I asked him in court, what was your methodology? What made your information special? He refused to testify, and that's in the record. Do you know, we can find it, but if you happen to know where that is? I do. It's three, volume three of the electronic record at 0348. Okay, thank you. Mr. Katz also testified that the plaintiffs owned three pieces of software, Moving Matrix, Movers Direct, and DeJoka. And this is in addition to the software, excuse me, the source code that you've heard about. But what neither he nor any of the other witnesses did was to submit evidence as to what made any of that software or any of that source code unique, what differentiated it from its competitors, and what made it valuable for not being known. Plaintiffs then compounded each of these fatal errors by failing to identify which of the four unique plaintiffs owned which piece of software, which source code, and which element of Google AdWords information. On the damages issue specifically, plaintiff's failure to provide non-speculative bases to award damages as to any one plaintiff, again, any one defendant, is dispositive to each of the legal claims, each of them, the preemptive claims and all the others. And that's because each of those claims required damages caused by something one of the defendants did to prove the claim. Plaintiff's damages expert, Mr. Pampanella, told both the jury and our judge, Judge Klausner himself, directly that there is nothing in his analysis that would allow the jury to determine which of the four plaintiffs suffered any harm due to the conduct of any one defendant. He said, I didn't look at it that way. He said he did not concern himself with the separateness of the four plaintiffs. But it does matter. The law respects corporate separateness for many good reasons. Also, and as we've already discussed, these are four distinct plaintiffs doing different things. It would be nonsensical to say that one plaintiff, say, for example, Budget, who's in the brokerage industry, in moving, can show liability, can show something that it had that somebody else did wrong to it. But then the fourth plaintiff, home expert, which is an entirely different industry, doing different things in lead generation, in home repair, well, that's the one that showed the damages, so they can just share. They can just borrow facts from each other. They can just borrow damages, evidence from each other. And that's why there's no reasonable basis for Judge Pampanella to have said to the jury, this is your one number. You can go divide it up. Which brings me to the third and most critical point here as a defense lawyer. The defendants are entitled to defend themselves, and they can only do that by effectively cross-examining the evidence before them. But if the four plaintiffs don't identify what is their trade secret, what is the thing, let alone what is their damages, my clients have no opportunity to cross-examine on any of those facts. Can I ask you a question about the Google data? Because I'm a little mixed up as to just what the claim, what is your understanding of what is the secret here? Is it the data that they get from Google itself, or is it something they do with the data? My understanding is that the claim changed over time. Initially, it was the fact of the Google AdWords themselves. And there's testimony in the record that Budget has, for example, 4 million Google AdWords keywords in its account. Not all of the plaintiffs have that. It varies from 4 million to 50. But what is the thing? And the thing is the methodology that Mr. Katz and his cousin, who he charged with managing these accounts on a day-to-day basis, the thing is what they did with the information. And that's exactly what we don't have evidence of. What did they do? Oh, I thought it was the set of words. Well, it could be both, which is why we hedged and asked, what are these Google AdWords? There's no evidence in the record of what they are. And then if you're going to say instead it's this marketing component piece of it that's a creation of what you did with the words, well, there's no evidence of that either, because we asked and you said I'm not going to say. And the first part of that, I mean, he did say that he had a set of words that he used, right? Yes. And so what, I mean, do you dispute the general proposition that a set of words used for marketing through Google could be a trade secret? No. Okay, so what was lacking here then? What are the words, and what is your use of them that makes it a secret? We don't have either of those pieces. And we also don't know which of the four plaintiffs own any of these words. Okay, but so the, I mean, where do we get the requirement that he actually disclosed the words themselves in the litigation, right? Because, I mean, to the extent that the trade secret hasn't been completely misappropriated, requiring him to do that would seem to sort of defeat the purpose of continuing to protect it, right? Right. So we have a case in Teleclear which prohibits catch-all phrases from being used, and that's one instance where it's a requirement that you identify what is the it, what is in the secret box, and there are a lot of different ways you can do that. You can submit expert declarations. You can have in-camera review. And this is the plaintiff's burden. They have to prove their case. And there are other cases too. In IMAX, the way it is, they were supposed to prove the dimensions and tolerances. They didn't do that. So it is their burden to show what it is that makes it a secret, and the plaintiffs did not do that. There's another, there's a source code case, We Ride, where the issue had to do with HD mapping algorithms, which on its face sounds, could be secret. But, again, in that case, what the court said was, you need to say what about this algorithm is a secret. What sets you apart in your algorithm from your competitors? What gives you that advantage? What is unique? And we don't have any of that here, beyond the idea that a Google AdWords account could be. And what do we do with the fact that they didn't have their expert on trade secrets because they only had four hours, or maybe because he wasn't available that week, or whatever? Well, a few points on that. One, if you look at the briefing on what Jeffrey Rushin would have said, all the briefing says is he would have said that the information that my clients are using in their company, Prime Marketing, is a replica of what was. So he was going to testify that, well, it is the same. He wasn't going to testify what the trade secrets were. There's no evidence of that in the record whatsoever. Also, I would note that plaintiffs rested with ten minutes to go in their time. They never called Jeffrey Rushin. They never asked for additional time. They never objected to the four-hour time limit, which, in point of fact, was a four-hour and 50-minute time limit, if you add the 20 for opening and the 30 for close, which Judge Klausner specifically invited the parties to use to their own discretion. He said, you all are the masters of your own case. Use the time as you see fit. And plaintiffs elected not to use the time by calling Jeffrey Rushin. But I would posit that there's nothing in the record that suggests that it would have made a difference, certainly not as to trade secrets and certainly not as to damages, which still would need to be proved to all plaintiffs as to all claims. As to the breach of contract damages, what's wrong with giving 11 months of salary? First of all, jury instruction number 15 and number 16. In those jury instructions, the jury was specifically instructed that it was lost profits that is what was the appropriate measure of damages. So the court instructed the jury, you will find lost profits if you find damages at all. He did not say salary and neither did the expert, James Pampanella, and neither did any of the jury instructions. Therefore, it was wholly inappropriate and entirely speculative for a jury to go back and try and create some mathematical formula as to 11 months of salary. Wait, I'm not sure I see it this way. Why doesn't 15 just say damages are from the breach and then 16 describes lost profits? I'm trying to catch up with you quickly, so maybe there's something more. But it's like this is how you calculate lost profits, but is there something that says the only type of contract damages is lost profits? So if you look at the third paragraph of instruction 15, it says plaintiff budget van lines also must prove the amount of its damages according to the following instructions. It does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages. Plaintiff claims damages for lost profits. And then if you go to the next instruction. So you want us to read that as plaintiff claims only damages for lost profits? Yes. But even if you were to say, well, perhaps we could reverse engineer some piece of this information that could have been provided, it was one of the three buckets, and there just is no connection because of what Mr. James Pampanella said when I asked him on cross as to equate, as to budget, who is the only plaintiff on the breach of contract claim, as to home expert, and as to quote runner. Can I tell from your analysis the damages that any one of them suffered? Yeah, but budget is the one who paid their salary, right? And if they gave 11 months of salary, that seems very logical. Well, it is a point in time, but Your Honor had to go herself and try and reverse engineer and try to create some logic out of this information, and there is no direct correlation to that. That's not a number that James Pampanella ever provided. His report is not in the record. Plaintiffs tried to get it in, and Judge Klausner said no. But we do have that Ms. Southar earned $150,000 a year. We know that they alleged that for 11 months she was working for both companies, and when you multiply 11 months times $150,000, you get $137,500. That's exactly what they awarded, so that's definitely what they did. Maybe. I wasn't there. Maybe. But in point of fact, they don't allege that. They actually said that the defendants collectively had this scheme going for a long period of time, and Mrs. Southar actually never worked for Prime, so the original conversation that is in the record happened in August. It would start the 11-month clock. That was a conversation at a birthday party. That's not any more than that, and so there is no claim. I don't even—well, I don't want to misspeak, but— She registered in September 2019, and then you get 11 months until they quit at the end of July. I trust your reading of the record right there, but there is no proof that Mrs. Southar was working for Prime. She never has, and there is evidence in the record that she wasn't then and she isn't now. Thank you. We're taking you over your time. I think we should probably add a little bit of time for your rebuttal because we just took her over her time. Why don't we give three minutes, please? Thank you very much. Keywords. Adwords. What is a keyword? Could we start—sorry. Where do you want to start? Could we start with how these four companies— I mean, I think the only way you can get your damages is if you can point to testimony that these four companies were sharing business or something. Absolutely. Can you point to where that is? Yes. Well, I don't have the sites in front of me, but Mr. Katz's testimony is not that significant, meaning it's not that long. It was one hour. Mr. Katz testified that he is the 100 percent owner of all these companies. He established all these companies. There's a unity of interest. They share employees. The Suthars themselves both testified they did work for every single— But if one of the companies is home repair and the other ones are moving, how do they lose customers the same way? The business is lead generation. That's what the software is. That's why they can share software with certain tweaks here and there. Home expert direct software was not just built from scratch. But so is the idea that Prime Marketing was also doing home repair? Prime Marketing was absolutely attempting to get into other avenues. How do you lose business and home repair unless Prime Marketing— I thought Prime Marketing was doing moving. I hadn't really appreciated this difference with home repair. They were attempting to get into other avenues. But attempting doesn't lose you customers yet, does it? How is the home repair company losing business? The damages that Mr. Pampanella put on relate to moving lead generation. So don't you have a problem with the one company that's about home repair? I think that's a reasonable take. And so what should we do? I mean, you might be able to—do we restore the damages as the other three? But we can't restore the whole verdict at that point unless you give me something else. So what do we do? I don't have anything I can credibly give the court. What I mean is home expert is in home repair. And at that point in time, Prime Marketing—I don't know what they're doing today, but they, as I understand it, weren't doing home repair business. And so if we hypothetically thought we could restore the verdict as to the three companies about moving but not as to the home repair one, is that all you want? Or do you want us to go on to the other issues? Or what's supposed to happen then? No, I think that would be—I think we would live with that result. I don't need my trade secret verdict reinstated and then go back and retry my breach of fiduciary duty case that shouldn't have been preempted because the damages were effectively the same damages on both those claims. So if Mr. Pampanello were giving breach of fiduciary duty damages and trade secret damages, his damage—he had a lost profit analysis for both, so it was the same. Why isn't that also true of the breach of contract damages? Well, it was true, and Mr. Pampanello took the position that lost profits was one way that we could get to breach of contract damages, and I certainly argued for that at closing. Now, in Mr. Pampanello's chart, he does lay out different categories other than lost profits, including salaries the Suthars received, including monies that the appellants paid to AIS, the overseas software development company that Ms. Suthar lied to us about. So there was other information in Mr. Pampanello's analysis and testimony for the jury to glean or to construct the damages they did for the breach of contract action. So in other words, I asked for lost profit damages on breach of contract. The jurors didn't want to give it to me. So can I just go back to your answer to the question Judge Friedland was asking you? I mean, it's a little bit odd. I mean, it's one thing for us to say, you know, the evidence supports, you know, just dividing it equally among all the companies, right? It's another thing, it seems different and arguably not permissible for us to say, the evidence supports dividing it equally among all the companies, except that there's some evidence that suggests that one of the companies shouldn't have gotten the damages, so we'll leave in place the division among three of them but knock out. I mean, that's not just sort of writing our own verdict, right? I don't disagree, and that's why I was a little bit thrown logistically when the question was posed to me. I think we have to go back to the actual offenses that were alleged and the jury found were committed. And there was evidence at trial that, let's focus on the Google AdWords account, that Home Expert had its own Google AdWords account that we argued was a trade secret, that the jury, there's plenty of evidence in the record, could have concluded was a trade secret, and that the defendants had access to and were found to have misappropriated, or at least we can reasonably infer from all the evidence in the verdict that they were found to misappropriate. That they were not themselves doing home repairs at that time does not mean that everything in that Google AdWords account, which is substantial, is solely related to home repair or only going to help home repair or that there's no other economic value that could be derived from that. All I was saying is that I am unaware of any damages specifically relating to home repair. I'm unaware of, at the time of trial or leading up to it, prime marketing operating and home repair. I don't understand how I assume the Google AdWords are somehow tied to home repair or else it wouldn't be useful to get ads to people who need home repair. So I don't understand how anyone could use those words to do anything else. There's millions and millions of words in them. Let me attack things from a different angle for you. We have all this software. We were talking about unity of interest. Your Honor asked about unity of interest, and I was telling you about that. All these companies share software. The question is who owns this software? We have joint ownership of copyrights. We have joint ownerships of other intellectual property. It could be reasonable for the jury to infer from the testimony Mr. Katz gave that at least some of this software that was misappropriated was jointly owned. If the software is jointly owned and the software is jointly misappropriated and the result is $17 million, it is a reasonable inference for the jury to chop up the damages in the way that they did. What is the $17 million? I thought it was like lost business. What is the $17 million estimating? It is lost business from trade secret theft. What we don't know sitting here today and what we can't surmise is whether the jury found that. But so if they're not in the business of home repair, how are they losing customers or business to someone who's not doing home repair? I was going about it a different angle. So what I am saying is that the software that was stolen, the suite of software, the jury could reasonably conclude that each of the appellants had an ownership stake in that software because of the unity of interest. But then it would have to be like how valuable is the software in itself, not lost customers. That's why I was asking you. What is the $17 million estimating? Well, it's the lost profits. The software all routes leads and helps run businesses. It's the very business that they do. They bring leads in. So was the home repair company getting profits from the other ones because it was like the royalties on the software or something? I mean, despite the sophistication of this business and the amount of revenue, I mean this is more of a mom-and-pop operation with one. I don't know the accounting intricacies, and I admit that the way that these companies were run is certainly an accounting nightmare. That doesn't mean that the defendant should be exculpated for trade theft. I still have one more. I still want to understand the Google AdWords. What is the trade secret? Absolutely, and it's very hard to understand without looking at, but I will do it for you, and I'll do it very quickly. So what a keyword is can be one word or a group of keywords, and they're in the moving lead generation business. I Google moving from Orange County to Nashville. That is a keyword. That is one of the four million things that they have and that they bid on, and they are paying Google to get their search results to the top of the page. We never contested at any point in pleadings throughout discovery at trial that we own that keyword, moving from Orange County to Nashville. What we own is the compilation of all the keywords in the Google Ad account. When you go into the Google Ad account, you have click-through and conversion rates. You have themes. You have campaigns, all sorts of things that we've built in there that show us not only these are the words that we're bidding on, the efficacy, how well they work, who's buying what. I'm simple-minded here. Google gives you a lot of data, right? When you pay for it, yes. I mean, I'm sure they give you free stuff, but for us, when you pay for it. But you don't know what's in it until you get it. So is your secret what they give you? It's the entire AdWords account, which has, let's say, four million, four million keywords in it, which, with that analytical data, allows us to assess how successful these words are or not successful there or what we should be paying more money to bid on. It's as simple as that. But if it's easier to just look at the collection of the words themselves, that's fine too. But there's much more to Google AdWords. And if this court were to find that a Google AdWords account, which here my clients, by the way,  and spent in excess of $5,050 million on this, if this court were to find in some way that Google AdWords accounts can't qualify as protectable trade secrets, it would turn this industry and the larger tech industry and lead generation industry on its head. So it's the entire account. And all the information within it, absolutely. And, by the way, if you go back to our… I think we now need to cut you off. Thank you, Your Honors. Thank you very much. Thank you, both sides, for the helpful arguments. This case is submitted.
judges: SCHROEDER, FRIEDLAND, MILLER